UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

COREY FORD,

                                        Plaintiff,

              v.                                                      9:09-CV-723
                                                                     (DNH/ATB)
BRIAN FISCHER, et al.,

                                        Defendants.

_____

COREY FORD, Plaintiff pro se
BRIAN J. O'DONNELL, Asst. Attorney General for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

### ORDER and REPORT-RECOMMENDATION

This matter was referred to me for Report and Recommendation by U.S. District

Judge David N. Hurd, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y.

72.3(c). Plaintiff's second amended complaint ("AC," Dkt. No. 28) seeks monetary

damages, under 42 U.S.C. § 1983, for various alleged violations of his constitutional

rights arising from his confinement by the New York State Department of Corrections

and Community Supervision ("DOCCS") at the Shawangunk Correctional Facility

("Shawangunk") in 2008 and 2009. On March 9, 2011, this court adopted my Report

and Recommendation, and granted defendants' motion to dismiss the amended

complaint in part and denied it in part. (Dkt. No. 46). Plaintiff's remaining claims are

against defendants Smith and Maly relating to the continuation of a mail watch against

plaintiff in 2008 and 2009, and against defendant Smith for his refusal to permit

plaintiff to marry. (*Id.*). On March 14, 2012, plaintiff moved for appointment of

counsel.  (Dkt. No. 72).  On March 23, 2012, defendants moved for summary judgment.  (Dkt. No. 74).  Plaintiff filed a response.  (Dkt. No. 78).  For the reasons set forth below, this court recommends denying plaintiff's motion for appointment of counsel without prejudice and granting in part and denying in part defendants' motion for summary judgment.

## DISCUSSION

### I.   Facts

On or about April 14, 2004, plaintiff was transferred to the Special Housing Unit ("SHU") at Shawangunk, following his violent assault on a correction officer at Green Haven Correctional Facility ("Green Haven").[1]  Plaintiff alleges, and defendants admit, that plaintiff was the subject of a "mail watch" at Shawangunk, from the time of his transfer in April 2004, through at least late 2009.  (AC, Facts ¶ 9; Defs.' Mem. of Law at 5–6, Dkt. No. 74-37).  Plaintiff claims that the screening of his incoming and outgoing mail at Shawangunk included some privileged legal mail, and resulted in delays of many days in delivery.  (AC ¶¶ 11–15, 22).  Shawangunk Superintendent Joseph T. Smith approved the initial mail watch, and renewed the approval every 60 days thereafter.  (AC, Facts ¶ 9; Defs.' Mem. of Law at 6, Dkt. No.

---

[1] Plaintiff threw hot oil in the face of the correction officer at Green Haven and then stabbed him three times.  *Ford v. Smith*, 23 A.D.3d 874, 875, 803 N.Y.S. 2d 821 (3d Dept. 2005), *lv. app. den.*, 6 N.Y. 708, 813 N.Y.S. 2d 44 (N.Y. 2006).  Plaintiff was found guilty of various disciplinary charges at Green Haven and sentenced to serve eight years in the SHU, which disposition was upheld in an Article 78 proceeding and affirmed on appeal.  *Id.*  Plaintiff was also convicted on related criminal charges in Dutchess County, New York, for which he was sentenced, on June 11, 2008, to a consecutive prison term of 22 years to life.  (AC ¶ 27; 6/11/08 Transcript of Sentencing at 1, 13–14, Dkt. No. 35-2 at 7, 19–20).

74-37).  Plaintiff alleges that John Maly, Deputy Superintendent for Security, was involved in executing the mail watch.  (AC ¶¶ 11–15, 22–23).

On March 22, 2009, plaintiff was charged in an Inmate Misbehavior Report based on two of his letters which were reviewed and confiscated by defendant Maly pursuant to the continuing mail watch.  In one letter, plaintiff asked an unincarcerated individual to harass and threaten plaintiff's "fiancee."  In the other letter, which plaintiff sent to another inmate through a person outside the facility (a prohibited activity known as "kiting"), plaintiff asked one inmate to assault another inmate.  (AC ¶ 25).

Plaintiff requested permission to marry his fiancee on or about April 1, 2008, while he was still confined in the SHU at Shawangunk.  Defendant Smith refused plaintiff's request based on his long-term SHU status and the staffing and security concerns associated with the marriage of a SHU inmate.  (AC ¶¶ 16–18; 4/24/08 Smith Ltr., Dkt. No. 35-3 at 58; Smith Aff. ¶ 14, Dkt. No. 74-3).  In April 2009, Supt. Smith indefinitely revoked the visiting privileges of plaintiff's fiancee because of her alleged involvement in smuggling a note from another inmate to plaintiff in the visiting room, and because of purported concerns for her safety based on the intercepted letter in which plaintiff allegedly asked another individual to harass and threaten her.  (AC ¶¶ 24, 30–32, 34).  Plaintiff alleges that he formally appealed the revocation of his fiancee's visitation rights to defendant Brian Fischer, the DOCS Commissioner, but did not receive any reply.  (AC ¶ 35).

3

## II.    Appointment of Counsel

Prior to evaluating a request for appointment of counsel, a party must first demonstrate that he is unable to obtain counsel through the private sector or public interest firms.  *Cooper v. A. Sargenti Co.*, *Inc.*, 877 F.2d 170, 173–74 (2d Cir. 1989) (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)).  In plaintiff's application, he does not indicate that he has attempted to locate counsel on his own; thus, his motion may be denied on that basis alone.

In addition, courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party.  *Hendricks v. Coughlin*, 114 F.3d 390, 392–93 (2d Cir. 1997).  Instead, a number of factors must be carefully considered by the court in ruling upon such a motion.  The threshold consideration in ruling on such an application is a showing of some likelihood that the action has merit.  *Cooper v. A. Sargenti Co.,* 877 F.2d 170, 172–74 (2d Cir. 1989).   Depending on the merits of the matter, the court should then consider:

> The indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)).  This is not to say that all, or indeed any, of these factors are controlling in a particular case.  Rather, each case must be decided on its own facts.  *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974

(N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Hodge*, 802 F.2d at 61).

Throughout this litigation, plaintiff has demonstrated his understanding of the issues in this case.  The pending summary judgment motion has been fully briefed, and plaintiff filed a response, containing appropriate arguments.  There is no showing that counsel is necessary at this time.  However, after the district judge has ruled on this report-recommendation, upon renewal of plaintiff's motion, the court may reconsider his request for counsel.  Thus, plaintiff's motion for appointment of counsel is denied without prejudice.

## III.   **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990).  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment."  *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987) (citation omitted).  A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

5

Fed. R. Civ. P. 56 (c)(1)(A).  If the moving party satisfies its burden, the nonmoving

party must move forward with specific facts showing that there is a genuine issue for

trial.  *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  In determining

whether there is a genuine issue of material fact, a court must resolve all ambiguities,

and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369

U.S. 654, 655 (1962).  However, when the moving party has met its burden, the

nonmoving party must do more than "simply show that there is some metaphysical

doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith

Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.*,

477 U.S. at 247–48.

## IV.   Mail Watch and Related Conduct

### A.   Mail Watch

#### 1.   Legal Standards

Among the protections enjoyed by prison inmates, subject to appropriate

limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed

by the First Amendment.  *LeBron v. Swaitek*, No. 05-CV-172 (GLS/DRH), 2007 U.S.

Dist. LEXIS 81587, at *21–22, 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007)

(Sharpe, J.) (quoting *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)).  "The

boundary between an inmate's First Amendment right to free speech and the ability of

prison officials to open or otherwise interfere with an inmate's mail is not precise."

*Cancel v. Goord*, No. 00 CIV 2042, 2001 U.S. Dist. LEXIS 3440, at *16,  2001 WL

303713 (S.D.N.Y. March 29, 2001).  This right, however, must yield to the legitimate

penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins*, 297 F.3d 108, 112–13 (2d Cir. 2002) (citing, *inter alia*, *U.S. v. Workman*, 80 F.3d 688, 699 (2d Cir.1996)). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987)).

Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safley*, 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection . . . to outgoing mail than to incoming mail." *Davis*, 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that "'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman*, 80 F.3d at 698 (quoting *Wolfish v. Levi*, 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom.*, *Bell v. Wolfish*, 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord*, 2001 U.S. Dist. LEXIS 3440, at *18. "[T]he interception of a prisoner's correspondence does not violate that individual's First Amendment rights 'if prison officials had good

7

or reasonable cause to inspect the mail.'" *Knight v. Keane*, No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at *18 (S.D.N.Y. August 26, 2005) (citing *United States v. Felipe*, 148 F.3d 101, 108 (2d Cir. 1998)).  Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail.  *Cancel v. Goord*, 2001 U.S. Dist. LEXIS 3440, at *17 (citing *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

### 2.    Application

Although the second amended complaint alleges that the mail watch was unlawful from its inception in April 2004 (AC, Facts ¶ 9), plaintiff's remaining claims seem to focus on his argument that the mail watch was improperly continued through 2008 and 2009, without any new or current factual information to establish good cause or penological justification.[2]  (AC ¶¶ 40, 52–53).

---

[2] As was noted in my report-recommendation related to defendants' motion to dismiss (Dkt. No. 43), plaintiff would likely be foreclosed from challenging the validity of the initial mail watch based on his prior litigation of this issue.  *See Ford v. Phillips, et al.*, 05 Civ. 6646, 2007 U.S. Dist. LEXIS 25226, 2007 WL 946703, at *14–15 (S.D.N.Y. Mar. 27, 2007) (rejecting this plaintiff's prior civil rights challenge to the mail watch at Shawangunk for the period from April 2004 through the date of filing of the complaint in that action in 2005).  In *Ford v. Phillips*, the judge concluded that DOCCS officials had ample good cause to monitor plaintiff's mail, including the need (1) to investigate his April 2004 assault on a correction officer at Green Haven, (2) to prevent Ford from instigating further violence following the assault, and (3) to monitor efforts by Ford to improperly influence witnesses in connection with his impending criminal trial.  *Id.* at *14.  The district judge in the Southern District also noted that, during the mail watch, DOCCS officials found, in or before 2006, at least one letter that was relevant to the prison's investigation of the assault, and one letter through which Ford attempted to influence a witness in his trial.  *Id.*  The second amended complaint points out that the state court judge who presided over plaintiff's criminal trial for the April 2004 assault, suppressed a letter seized pursuant to the mail watch in late 2004.  (AC ¶ 10).  Transcripts of the state court proceedings

Liberally construing the second amended complaint, plaintiff alleges that his constitutional rights were violated because successive 60-day renewals of the mail watch were "rubber stamp[ed]" by Supt. Smith through 2008 and 2009, without any "new underlying facts" establishing good cause to continue the mail watch.  (AC ¶¶ 40, 52–53).  As a result of the mail watch, plaintiff alleges that mail was "with-held [sic] up to 9 day[s] or more at a time" and "thrown away with no legitiment [sic] penological interest."  (Pl.'s Mem. of Law in Supp. of Pl.'s Mot. Rep. to Summ. J. p. 2, Dkt. No. 78).

Superintendent Smith affirmed that the mail watch only covered plaintiff's general correspondence.  His legal mail was processed as usual through the United States Postal Service, and only opened and inspected for contraband in plaintiff's presence.  (Smith Aff. ¶ 8, Dkt. No. 74-3; *see also* Dkt. Smith Aff. ¶ 7, Dkt. No. 74-9).  Defendant Maly affirmed that he did not examine plaintiff's legal mail as part of the

---

submitted by plaintiff in opposition to defendants' motion, make clear that the state court judge found that repeated 60-day renewals of the mail watch, without any factual statements of justification, violated "due process" because DOCCS did not follow its own rules and regulations, in DOCCS Directive 4422.  (Dkt. No. 35-2 at 1–4; AC ¶ 10).  It is not clear whether the state judge purported to apply New York state or federal due process standards.  However, a violation of DOCCS directives in connection with the mail watch would not constitute a federal constitutional violation cognizable under Section 1983.  *See, e.g., Dillhunt v. Theriault*, No. 9:07-CV-0412 (GTS/DEP) 2009 U.S. Dist. LEXIS 117125, 2009 WL 4985477, at *11 (collecting cases) (N.D.N.Y. Dec. 15, 2009).  Hence, the state judge's suppression ruling would not undermine the preclusive effect of the federal judge's adverse ruling in the Southern District of New York on plaintiff's federal constitutional claim relating to the mail watch during the period from April 2004 through the date plaintiff filed the prior action in 2005.  If plaintiff were attempting to relitigate the legality of the initial mail watch in this action, he would be barred by claim preclusion.  *Ford v. Krusen*, 9:06-CV-890 (GTS/DEP), 2009 U.S. Dist. LEXIS 29044, 2009 WL 959534, at *7 (N.D.N.Y. Apr. 6, 2009) (Corey Ford's prior, unsuccessful, due process challenge to the disciplinary hearing leading to his prolonged SHU confinement in the Southern District of New York barred him from pursuing that claim further in a subsequent action in the Northern District of New York).

mail watch, except for one piece of correspondence that purported to be legal mail, but looked suspicious.  (Maly Aff. ¶ 17–18, Dkt. No. 74-10).  This piece of mail appeared to be from the Dutchess County Public Defender, but the address and return address were handwritten, "Dutches County" and "Poughkeepie" were misspelled in the return address, Shawangunk Correctional Facility was written as "Shawangunk Correction Facilities," and the envelope had an adhesive "stamp" on it, rather than the mark of a postage meter.[3]  (Maly Aff. ¶ 17, Dkt. No. 74-10; *see also* Dkt. No. 74-12 p. 2).[4]  Defendant Maly opened the letter and discovered it was from one of plaintiff's non-legal correspondents, and not from the Dutchess County Public Defender, as the return address seemed to indicate.  (*Id.*).

No issue of fact exists as to plaintiff's legal mail, which was not subject to a mail watch and was not intercepted or read by either defendant.  Plaintiff submits copies of envelopes from his then attorney David Steinberg that plaintiff claims were "delayed and read outside of his presence."  (Ford Decl. ¶ 13, Dkt. No. 77-1; Dkt. No. 78-3 pp. 6–9).  Plaintiff is attempting to show a pattern by comparing the date that the mail was sent by his attorney and the date it was stamped received by the facility.  The only thing that plaintiff's evidence shows is that one piece of legal mail took nine days to arrive.  (Dkt. No. 78-3 p. 6).  Two other arrived within one day and one arrived within four days (Dkt. No. 78-3 pp. 7–9).  This does show a pattern of delay, but

---

[3] A postage meter prints information directly on an envelope, and the postage on the piece of mail here was a printed label, such as those purchased at a post office counter.

[4] The date of this piece of correspondence is not clear from the envelope and defendant Maly does not state the time period during which he opened it.  (*Id.*).

rather that one letter may have taken longer to arrive.  These envelopes do *not* show that any legal mail was read outside of plaintiff's presence.   Therefore, defendants should be granted summary judgment as to plaintiff's First Amendment claims related to his legal mail.

The remaining issue relates to the mail watch on plaintiff's general mail from January 2008 through March 2009.  (*See* AC 40, 52–53; Pl.'s Mem. of L. in Supp. of Pl.'s Mot. Rep. to Summ. J. p. 4).  With regards to plaintiff's general mail, the allegations of the amended complaint and related documents identify two abuses of the prison mail system by plaintiff in March 2009 that would certainly appear to justify a mail watch for some period of time thereafter.[5]  DOCCS reviewed and confiscated two sets of letters from plaintiff at that time—one which allegedly reflected an effort by plaintiff to harass or threaten his fiancee through others outside the institution over some disputed money, and another, which was improperly "kited" through someone outside the facility, and which purportedly sought to induce one inmate to threaten or do harm to another inmate at plaintiff's behest.  (AC ¶ 25).[6]

---

[5] *See, e.g., Jackson v. Portuondo*, No. 9:01-CV-00379, 2007 U.S. Dist. LEXIS 11621, 2007 WL 607342, at *6 –7, 13 (granting summary judgment on claim challenging mail watch, which was supported by evidence that inmate was "kiting" mail in an effort to harm another inmate and smuggle contraband) (citing, *inter alia*, *United States v. Felipe*, 148 F.3d 101, 107–108 (2d Cir. 1998) (knowledge that plaintiff had violated prison regulations related to mail, and had written about the commission of illegal acts constituted reasonable cause to intercept the inmate's correspondence).

[6] Notwithstanding plaintiff's dispute about the import of these letters, the text clearly implicated the safety and security concerns of the facility.  Hence, the confiscation of this particular mail would clearly be supported by good cause and would not support a Section 1983 claim.  *See Ford v. Phillips*, 2007 WL 946703, at *14 (confiscation of letters admitting to assault and attempting to properly influence witnesses "did not go beyond what was necessary to protect the prison's legitimate penological interests").

Superintendent Smith affirms that he "continued the mail watch at sixty-day intervals based on letters that have been kited by and to Inmate Ford, who does not have permission to send correspondence to or receive correspondence from other inmates." (Smith Aff. ¶ 7, Dkt. No. 74-3). Superintendent Smith also affirmed that "Inmate Ford continued violating correspondence rules throughout 2008 and 2009, [and Smith] authorized the continuance of the mail watch on [plaintiff's] correspondence during that time period." (Smith Aff. ¶ 6, Dkt. No. 74-9). Superintendent Smith does not indicate when the relevant letters were discovered, and did not supply copies of the letters plaintiff allegedly kited.

Defendant Maly affirms that plaintiff's "regular practice" of kiting letters "along with his criminal and disciplinary histories among other things" justified the continuation of the mail watch during 2008 and 2009. (Maly Aff. ¶ 25, Dkt. No. 74-10). Defendant Maly explains that plaintiff did not receive any misbehavior reports because the "information value" of the mail watch was greater than the value of issuing plaintiff a misbehavior report. (*Id* at ¶ 26). Maly further affirms that he regularly discussed with Superintendent Smith what he observed while conducting the mail watch, and that he "generally did not photocopy the correspondence [he] reviewed, although [he] did copy some [letters] that were of particular importance," such as the letters that were the subject of the misbehavior report in 2009. (*Id* at ¶ 27, 29). Defendant Maly also does not specifically indicate when any inappropriate letters were discovered, and he does not supply any letters plaintiff allegedly kited between January 2008 and March 2009.    Plaintiff argues that "there was no justification for

12

the mail watch," and points out that defendants provide no dates or specific information establishing that he violated any mail regulations between January 2008 and March 2009.  (Pl.'s Mem. of L. in Supp. of Pl.'s Mot. Rep. to Summ. J. p. 10).

The Second Circuit has suggested that, although prison officials are entitled to considerable deference in ordering a mail watch for security reasons, justification for a mail watch should be relatively current, and the duration of the screening of mail should be related to the  perceived threat.  *Duamutef v. Hollins*, 297 F.3d at 113 (mail-related disciplinary charge in 1994, following a history of involvement in prohibited organizational activities, was not too remote to justify a "temporary" (30-day) watch on plaintiff's mail in 1995).  Without more specific documentation or evidence, an issue of fact exists as to whether good cause existed for the continuing mail watch of plaintiff's general mail, at least after January 2008.  Accordingly, defendants should be denied summary judgment as to plaintiff's claims related to interference with this general mail between January 2008 and March 2009.

 Defendants argue that the mail watch authorization procedures used by defendants Smith and Maly in this case, although not completely consistent with DOCCS Directive 4422, were previously used and "approved" by U.S. Senior District Judge Thomas J. McAvoy in *Zimmerman v. Seyfert*, 9:03-CV-1389 (TJM), 2007 Dist. LEXIS 52388, at *86–88, 2007 WL 2080517 (N.D.N.Y.  July 19, 2007).  (Defs.' Mem. of Law p. 6, Dkt. No. 74-37).  The mail watch in *Zimmerman* was initiated by Supt. Smith on May 16, 2003 because of an ongoing criminal investigation of the plaintiff in that case for escape, and was extended every 60 days until June 22, 2005.

13

2007 Dist. LEXIS 52388, at *86–87.  There was no discussion, in *Zimmerman*, of any additional justification for the mail watch over the approximately **two years** that it was in place.  Plaintiff Zimmerman alleged that Supt. Smith improperly "instituted" the mail watch against him, *id.* at *86.  There was no indication that Zimmerman challenged the extensions of the mail watch based on the apparent absence of renewed justification.  Judge McAvoy dismissed Zimmerman's First Amendment challenge to the mail watch.  However, because the issue directly raised by plaintiff Ford in this case was apparently not addressed in *Zimmerman*, I conclude that Judge McAvoy's holding in that case does not suggest "approval" of the reauthorizations, between January 2008 and March 2009, of the mail watch against Ford (which was instituted in **April 2004)**, in the absence of some additional showing of justification.

## V.   Denial of Plaintiff's Request to Marry

The Supreme Court has recognized that prisoners have a fundamental constitutional right to marry.  *Turner v. Safely*, 482 U.S. at 95, 96 (citing *Zablocki v. Redhail*, 434 U.S. 374 (1978) and *Loving v. Virginia*, 388 U.S. 1, 12 (1967)).  However, the right to marry, like many other rights is subject to substantial restrictions as a result of incarceration.  *Turner*, 482 U.S. at 95.  In determining whether a prison regulation that infringes on a fundamental right is reasonable, a court must decide:  (1) whether there is a "valid rational connection" between the regulation and a legitimate and neutral governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison

staff, on an inmates' liberty, and on the allocation of limited prison resources; and (4) whether the regulation is reasonable, or whether it represents an "exaggerated response" to prison concerns.  *Turner*, 482 U.S. at 89–90.[7]

Plaintiff alleges that defendant Smith improperly denied his request to marry based on plaintiff's long-term SHU status, pursuant to DOCS Directive 4201, which grants the Superintendent of a DOCS facility the discretion to deny a marriage request for an inmate confined in disciplinary housing.  (AC ¶¶ 16–17, 20).  At the time he made his request in 2008, plaintiff faced approximately four more years in SHU confinement.

In *Turner*, the Supreme Court invalidated a Missouri regulation which prohibited inmates from marrying other inmates or civilians unless the prison superintendent determined that there were compelling reasons for the marriage, finding that this "almost complete ban on the decision to marry" was not reasonably related to any legitimate penological objective.  *Turner v. Safely*, 482 U.S. at 94–99. There is some case law which suggests that temporary delays in allowing an inmate to marry for disciplinary reasons would pass muster under the *Turner* standards, but indefinite or prolonged refusals might not.  *See, e.g.*, *Castellanos v. Gomez*, C-93-

---

[7] The *Turner* court did not decide whether an inmate's right to marry should be reviewed under a more stringent standard than the "reasonable relationship" test because it also implicates the rights of marriage partners who are not prisoners.  *Turner v. Safely*, 482 U.S. 97.  However, two years thereafter, the Supreme Court made clear that to apply a heightened level of scrutiny to cases involving prison regulations affecting the rights of both prisoners and outsiders would unreasonably constrain the corrections system.  *See Thornburgh v. Abbott*, 490 U.S. 401, 410 n.9 (1989) (any attempt to forge separate standards for cases implicating the First Amendment rights of outsiders and inmates is out of step with Supreme Court case law).

0503, 1994 U.S. Dist. LEXIS 13612, 1994 WL 519465, at *6 (N.D. Cal. Sept. 21, 1994) (although defendants' initial statement to plaintiff that there were no procedures in place for SHU inmate marriages approaches the blanket denial of marriage held unconstitutional in *Turner*, defendants moved expeditiously to put procedures in place to allow the marriage; plaintiff's Section 1983 claims based on the defendants' 12-month delay in allowing his marriage dismissed under Rule 56); *Martin v. Snyder,* 329 F.3d 919, 921–22 (7th Cir. 2003) (because warden postponed, but did not preclude inmate's marriage based on a disciplinary charge and temporary denial of visitation of plaintiff's girlfriend, constitutional claim based on 12-month delay in marriage was properly dismissed).

Prison officials have some burden to demonstrate a penological justification for restricting an inmate's right to marry, and to satisfy the other elements of the *Turner* test. *See Salahuddin v. Goord*, 467 F.3d 263, 275 (2d Cir. 2006) (under *Turner*, the defendants bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational). *Salahuddin v. Goord* also holds that the *Turner* test applies not only to challenged regulations but also individualized official actions. 467 F.3d 263, 274 n.4.

Superintendent Smith asserts that he denied plaintiff's request to get married so he could use plaintiff's desire to get married "as an incentive to improve [plaintiff's] conduct to the point at which he could apply for a reduction in his SHU sentence." (Smith Aff. ¶ 10, Dkt. No. 74-9). Superintendent Smith, in a memorandum to plaintiff

dated April 17, 2008, stated that he had received plaintiff's letters requesting permission to marry, and was "considering options concerning this matter." (Dkt. No. 74-7 p. 2). Superintendent Smith encouraged plaintiff to "continue your efforts at maintaining family ties," and that "[w]ith time, you will be able to work your way out of SHU via the review committee process." (*Id.*). Superintendent Smith affirmed that the review committee process is a way for inmates with long SHU penalties to reduce their penalties due to good behavior. (Smith Aff. ¶ 12, Dkt. No. 74-3). Getting married was apparently not a significant incentive, as plaintiff was found guilty of drug use in August 2008. (Dkt. No. 74-11 p. 5). Plaintiff did not ask again for permission to marry.

As described above, Superintendent Smith did not foreclose plaintiff from ever marrying. He attempted to used plaintiff's desire to be married to motivate plaintiff to improve his behavior. Superintendent Smith's memorandum to plaintiff made it clear that plaintiff needed to improve his behavior and thereby reduce his time in the SHU. Plaintiff references Superintendent Smith's permission in December 2008 for plaintiff to take pictures with his girlfriend and her children as evidence that the security and staffing concerns mentioned by Superintendent Smith in relation to plaintiff's marriage request were negligible and easily remedied. (*See* Ford Decl. ¶ 35, Dkt. No. 77-1; Smith Aff. ¶ 14, Dkt. No. 74-3; *see also* Defs.' 7.1 Stmt. Annot. ¶¶ 22–23). However, the permission to take photographs also indicates that Superintendent Smith, while not giving plaintiff permission to marry, was granting accommodations to plaintiff, allowing him to maintain relationships with his family as well as

reinforcing plaintiff's desire to marry as an incentive.  Superintendent Smith's denial of plaintiff's marriage request in April 2008 was reasonably related to the legitimate penological interest of improving plaintiff's behavior while in the SHU.  He was in SHU for a serious offense against a corrections officer, and improving plaintiff's behavior while incarcerated is a legitimate penological concern of Superintendent Smith.  Accordingly, defendants should be granted summary judgment as to plaintiff's claims based on the denial of his marriage request.

WHEREFORE, based on the findings above, it is

ORDERED, that plaintiff's motion for appointment of counsel (Dkt. No. 72) be DENIED WITHOUT PREJUDICE; and it is further

RECOMMENDED, that defendants' motion be DENIED IN PART as to plaintiff's First Amendment claims based on interference with his general mail between January 2008 and March 2009, and that defendants' motion be GRANTED IN PART as to all other remaining claims.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: August 7, 2012

Hon. Andrew T. Baxter
U.S. Magistrate Judge